JOSEPH CLEM, Appellant, *v.* THE STATE
OF NEVADA, Respondent.

No. 40008

KENNETH BRIDGEWATER, Appellant, *v.* THE STATE
OF NEVADA, Respondent.

No. 40009

GERALD BRIDGEWATER and JAMES PLAYER, Appellants,
*v.* THE STATE OF NEVADA, Respondent.

No. 40028

December 30, 2003                                  81 P.3d 521

*JoNell Thomas,* Las Vegas, for Appellant Joseph Clem.

*Christopher R. Oram,* Las Vegas, for Appellant Kenneth Bridgewater.

*J. Chip Siegel, Chtd.,* and *Jay L. Siegel,* Las Vegas, for Appellants Gerald Bridgewater and James Player.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

Before the Court EN BANC.

## OPINION

*Per Curiam:*

These are consolidated appeals from orders of the district court denying appellants' post-conviction petitions for writs of habeas corpus. Appellants challenge their sentence enhancements for the use of deadly weapons on the ground that they are entitled to the benefit of the deadly-weapon definition set forth in *Zgombic v. State.*[1] Appellants rely primarily on the United States Supreme Court decision of *Fiore v. White*[2] and the distinction in *Bousley v. United States*[3] between the retroactivity rules applicable to decisions interpreting federal criminal statutes and those applicable to decisions announcing constitutional rules of criminal procedure. We conclude that appellants cannot avoid the law of the case, which upholds the validity of appellants' sentence enhancements, and have failed to overcome the procedural bars of NRS Chapter 34.

---

[1]106 Nev. 571, 798 P.2d 548 (1990).

[2]531 U.S. 225 (2001).

[3]523 U.S. 614 (1998).

## FACTS

On September 26, 1986, appellants Joseph Clem, Gerald and Kenneth Bridgewater, and James Player were convicted pursuant to a jury trial of first-degree kidnapping, extortion and mayhem.[4] The sentences for the crimes were enhanced, consistent with NRS 193.165, for appellants' use of deadly weapons, *i.e.,* a "red-hot table fork and heated electric iron," to burn the victim during the commission of the crimes.[5] At the time of appellants' crimes, NRS 193.165 did not define "deadly weapon," but required imposition of a sentence equal and consecutive to the term of imprisonment prescribed by statute for the crime being committed with the use of "a firearm or other deadly weapon."[6]

Appellants appealed to this court from their judgments of conviction, arguing, in part, that simple household items not proven capable of inflicting death could not qualify as deadly weapons under NRS 193.165.[7]

On August 25, 1988, we affirmed appellants' convictions and sentences. In rejecting their argument on the enhancement issue, we interpreted for the first time the meaning of "deadly weapon" as that term is employed at NRS 193.165. We then adopted a functional test, which considers how an instrument is used and the facts and circumstances of its use to determine whether the instrument is a deadly weapon. Applying this test, we concluded that appellants' use of the red-hot table fork and heated electric iron constituted the use of deadly weapons.[8] We issued remittiturs in the direct appeals on September 13, 1988.

On May 15, 1989, appellants filed identical proper person petitions for post-conviction relief, which the district court denied. We summarily dismissed the appeals from the denials of these petitions.[9]

On September 13, 1990, in *Zgombic v. State,*[10] we reexamined our decision in *Clem v. State* and overruled its functional test, replacing it with a narrower test that required the instrument used to be "inherently dangerous" to qualify as a deadly weapon under NRS 193.165.[11] We defined "inherently dangerous" to mean "that

---

[4]Codefendant James Cook was likewise convicted, but Cook is not a party to the instant proceedings and warrants no further mention.

[5]*Clem v. State,* 104 Nev. 351, 353-54, 760 P.2d 103, 104-05 (1988), *overruled in part by Zgombic v. State,* 106 Nev. 571, 798 P.2d 548 (1990).

[6]*See* 1981 Nev. Stat., ch. 780, § 1, at 2050.

[7]*Clem,* 104 Nev. at 356, 760 P.2d at 106.

[8]*Id.* at 356-57, 760 P.2d at 106-07.

[9]*Clem v. State,* Docket No. 21422 (Order Dismissing Appeal, October 29, 1990).

[10]106 Nev. 571, 798 P.2d 548.

[11]*Id.* at 574, 798 P.2d at 549-50.

the instrumentality itself, if used in the ordinary manner contemplated by its design and construction, will, or is likely to, cause a life-threatening injury or death."[12]

On December 13, 1990, appellants filed a proper person postconviction petition for a writ of habeas corpus in the Seventh Judicial District Court, claiming that *Zgombic*'s "inherently dangerous" test must be applied retroactively to their cases. On September 16, 1991, appellant Gerald Bridgewater also raised the same claim in an individually filed proper person petition for a writ of habeas corpus in the First Judicial District Court. The district courts denied the petitions, and on appeal to this court, the cases were consolidated.[13] On December 23, 1993, in *Bridgewater v. Warden*,[14] we affirmed the denials of appellants' petitions. We rejected their retroactivity argument on the merits, concluding that "*Zgombic* created a new, unforeseeable definition of 'deadly weapon' which is not of constitutional moment."[15]

In 1995, *Zgombic*'s narrow definition of "deadly weapon" was superseded by legislative amendment to NRS 193.165.[16] The amendment added a statutory definition of "deadly weapon," which incorporates both *Clem*'s functional test and *Zgombic*'s "inherently dangerous" test. However, as we have recognized, the amendment applies only to crimes committed on or after October 1, 1995.[17]

It appears that after the legislative amendment, appellants, with the possible exception of Kenneth Bridgewater, continued, unsuccessfully, to seek relief from federal courts as well as from this court.[18]

---

[12]*Id.* at 576-77, 798 P.2d at 551.

[13]*Bridgewater v. Warden*, 109 Nev. 1159, 1161, 865 P.2d 1166, 1167 (1993).

[14]*Id.* at 1159, 865 P.2d at 1166.

[15]*Id.* at 1161, 865 P.2d at 1167 (citing *Gier v. District Court*, 106 Nev. 208, 789 P.2d 1245 (1990)).

[16]1995 Nev. Stat., ch. 455, §§ 1-2, at 1431. Prior to the 1995 amendment, the Legislature had made only technical amendments to NRS 193.165, effective June 20, 1991, but made no substantive amendment in response to *Zgombic. See* 1991 Nev. Stat., ch. 403, §§ 6, 10, at 1059, 1061.

[17]*See* 1995 Nev. Stat., ch. 455, §§ 1-2, at 1431; *Buff v. State,* 114 Nev. 1237, 1242-43 n.2, 970 P.2d 564, 567 n.2 (1998); *Thomas v. State,* 114 Nev. 1127, 1146 n.4, 967 P.2d 1111, 1123 n.4 (1998).

[18]Appellants have not provided this court with a full record of relevant litigation. We are aware of the proceedings addressed at: *Bridgewater v. Hardison,* 100 F.3d 961, 1996 WL 640473 (9th Cir. 1996) (unpublished decision), *cert. denied,* 520 U.S. 1172 (1997); *Clem v. Angelone,* 100 F.3d 961, 1996 WL 640474 (9th Cir. 1996) (unpublished decision), *cert. denied,* 520 U.S. 1172 (1997); *Player v. State,* Docket No. 28796 (Order Dismissing Appeal, July 26, 1996); and *Player v. State,* Docket No. 36724 (Order of Affirmance, December 18, 2001).

Finally, on October 9, 2001, appellants filed in the Eighth Judicial District Court the post-conviction petitions for writs of habeas corpus at issue here. Each petition raised the issue of whether appellants are entitled to the benefit of *Zgombic*'s narrowed definition of "deadly weapon." The State opposed the petitions and asserted the law of the case doctrine, laches, the time bar at NRS 34.726, and the successive petition bar at NRS 34.810(2). The district court heard argument on the petitions and denied relief. The court entered its final orders on October 11, 2002. Appellants now appeal from these orders.[19]

## DISCUSSION

The law of the case doctrine holds that the law of a first appeal is the law of the case on all subsequent appeals in which the facts are substantially the same.[20] In *Clem,* we ruled that appellants' sentence enhancements for the use of a deadly weapon were valid. In *Bridgewater,* we decided that *Zgombic*'s new, narrower definition of "deadly weapon" was not retroactive. These prior decisions now stand as the law of the case. We will depart from our prior holdings only where we determine that they are so clearly erroneous that continued adherence to them would work a manifest injustice.[21]

Additionally, appellants filed the petitions at hand more than thirteen years after this court issued its remittiturs in the direct appeals, and they have previously raised and received determinations on the merits of the claim that *Zgombic*'s definition applies retroactively to their cases. Thus, the one-year time bar at NRS 34.726 and the successive petition bar at NRS 34.810(2) apply here.[22] Appellants may overcome these procedural bars with a sufficient showing of good cause and actual prejudice.[23]

[19]Although appellants' notices of appeal were filed before the final orders were entered on October 11, 2002, we conclude that we have jurisdiction to consider the correctness of these orders. *See* NRAP 4(b).

[20]*Hall v. State,* 91 Nev. 314, 315, 535 P.2d 797, 798 (1975).

[21]*See Arizona v. California,* 460 U.S. 605, 618 n.8 (1983); *cf. Leslie v. Warden,* 118 Nev. 773, 779-80, 59 P.3d 440, 445-46 (2002) (recognizing that the law of the case may be revisited where the failure to do so would work a fundamental miscarriage of justice).

[22]Although the State also raises laches under NRS 34.800 and the equitable-laches doctrine of *Hart v. State,* 116 Nev. 558, 1 P.3d 969 (2000), the district court's order did not rely on laches to bar relief. Because we have determined that appellants' claims are barred under the law of the case, NRS 34.726 and NRS 34.810, we need not address whether NRS 34.800 may apply here. The equitable-laches doctrine recognized in *Hart* applies to motions to withdraw a guilty plea and is inapplicable to petitions brought under NRS Chapter 34.

[23]*See* NRS 34.726(1); NRS 34.810(3).

To establish good cause, appellants must show that an impediment external to the defense prevented their compliance with the applicable procedural rules.[24] A qualifying impediment might be shown where the factual or legal basis for a claim was not reasonably available at the time of any default.[25] In *Kimmel v. Warden,* this court opined, without deciding, that new state-law claims might constitute good cause in this context.[26] However, we now determine that proper respect for the finality of convictions demands that this ground for good cause be limited to previously unavailable constitutional claims.[27] Further, appellants cannot manufacture good cause, as they largely attempt to do here, by arguing that this court's prior decisions were erroneous under the law that existed at the time of those decisions.[28] Absent good cause, appellants may only defeat the statutory procedural bars by showing that they have suffered a fundamental miscarriage of justice.[29] The fundamental miscarriage of justice standard requires a colorable showing that constitutional error has resulted in the conviction of one who is actually innocent.[30]

Appellants primarily contend that this court erroneously held in *Bridgewater* that our decision in *Zgombic* does not apply to their cases and that this error allows them to avoid the procedural bars. Appellants rely mainly on *Fiore v. White,*[31] a recent opinion by the United States Supreme Court. They assert that *Fiore* established new law and that this law governs here. According to appellants, under *Fiore* retroactivity is not an issue here because *Zgombic* simply clarified the law as it existed at the time of their convictions and therefore its stricter definition of ''deadly weapon'' applies to

---

[24]*See Passanisi v. Director, Dep't Prisons,* 105 Nev. 63, 66, 769 P.2d 72, 74 (1989).

[25]*Harris v. Warden,* 114 Nev. 956, 959-60 & n.4, 964 P.2d 785, 787-88 & n.4 (1998).

[26]101 Nev. 6, 692 P.2d 1286 (1985).

[27]*See generally Engle v. Isaac,* 456 U.S. 107 (1982). *See also Reed v. Ross,* 468 U.S. 1, 16 (1984) (holding that where a constitutional claim is so novel that its basis was not reasonably available, a defendant has cause for his default under state procedural rules). We note that whether a reasonable basis existed from which to develop or construct a legal theory may involve reference to the tests for determining whether a rule is ''new'' for retroactivity purposes, which is discussed *infra. See Ross,* 468 U.S. at 17-18.

[28]*See Hathaway v. State,* 119 Nev. 248, 252-53, 71 P.3d 503, 506 (2003); *Evans v. State,* 117 Nev. 609, 643-44, 28 P.3d 498, 521 (2001); *see also Isaac,* 456 U.S. at 134.

[29]*See Pellegrini v. State,* 117 Nev. 860, 887, 34 P.3d 519, 537 (2001) (recognizing that a fundamental miscarriage of justice will defeat the statutory procedural bars at NRS 34.726 and NRS 34.810).

[30]*See id.*

[31]531 U.S. 225.

their cases. Appellants also argue that even if *Zgombic* announced new law that should be subject to retroactivity analysis, our decision in *Bridgewater* failed to appreciate that *Zgombic* made substantive law, requiring retroactive application under *Bousley v. United States.*[32]

We conclude that appellants' efforts to overcome the procedural bars fail. As we explain below, *Fiore* did not establish new law and does not govern here. Further, this court did make new law in *Zgombic,* and our decision not to apply that law retroactively to final convictions is sound.[33] Appellants' actual innocence claim fails because it mistakenly assumes that constitutional error occurred and entitles appellants to *Zgombic*'s definition.

The United States Supreme Court's decision in *Fiore* concerned a conviction for violating a Pennsylvania statute that prohibited operating a waste facility without a permit. The Pennsylvania Supreme Court declined review, and Fiore's conviction became final. Later, the Pennsylvania Supreme Court reviewed the conviction of Fiore's codefendant, Scarpone, interpreted the same state statute—for the first time—and held on nearly identical facts that Scarpone had not violated the statute.[34] Based on the decision in Scarpone's case, Fiore unsuccessfully sought collateral relief in state courts. He then brought a federal habeas corpus action, and the federal district court granted the writ. But the Third Circuit reversed, reasoning that " 'state courts are under no [federal] constitutional obligation to apply their decisions retroactively.' "[35]

The United States Supreme Court "granted certiorari in part to decide when, or whether, the Federal Due Process Clause requires a State to apply a new interpretation of a state criminal statute retroactively to cases on collateral review."[36] To determine if that issue was actually presented, the Court submitted a certified question to the Pennsylvania Supreme Court asking "whether its decision interpreting the statute not to apply to conduct like Fiore's was a new interpretation, or whether it was, instead, a correct statement of the law when Fiore's conviction became final."[37] The Pennsylvania Supreme Court replied:

> "*Scarpone* did not announce a new rule of law. Our ruling merely clarified the plain language of the statute. . . . Our in-

---

[32]523 U.S. 614.

[33]We conclude that appellants' petitions are procedurally barred. We discuss the substance of the retroactivity issues because they are integral to appellants' claims of good cause, prejudice and fundamental miscarriage of justice.

[34]531 U.S. at 226-27 (citing *Commonwealth v. Scarpone,* 634 A.2d 1109, 1112 (Pa. 1993)).

[35]*Id.* at 227-28 (quoting *Fiore v. White,* 149 F.3d 221, 222 (3d Cir. 1998)).

[36]*Id.* at 226.

[37]*Id.*

terpretation . . . in *Scarpone* furnishes the proper statement of law at the date Fiore's conviction became final."[38]

The United States Supreme Court then held that Fiore's case "present[ed] no issue of retroactivity" because, in Scarpone's case, the state court merely clarified what the statute meant at the time of Fiore's conviction. Thus, *Scarpone* was "not new law."[39] But as a consequence, Fiore stood convicted for conduct that the state criminal statute, as properly interpreted, did not prohibit.[40] As the United States Supreme Court's precedents made clear, Fiore's conviction violated the Federal Due Process Clause, which forbids a state to convict a person of a crime without proving the elements of the crime beyond a reasonable doubt.[41]

Although appellants strenuously argue that the law stated in *Fiore* was unavailable at the time of their earlier petitions and thus provides good cause to overcome the procedural bars, we disagree. The Supreme Court did not announce new law in *Fiore*; it merely held that, consistent with the "Court's precedents," Fiore could not be convicted without proof of each element of a crime beyond a reasonable doubt.[42]

We read *Fiore* to hold only that constitutional due process requires the availability of habeas relief when a state's highest court interprets for the first time and clarifies the provisions of a state criminal statute to exclude a defendant's acts from the statute's reach at the time the defendant's conviction became final.[43] *Fiore* does not undermine the rule that "[a] change of law does not invalidate a conviction obtained under an earlier law."[44] Even considering *Fiore,* a change in the law properly remains subject to

[38]*Id.* at 228 (quoting *Fiore v. White,* 757 A.2d 842, 848-49 (Pa. 2000)).

[39]*Id.*

[40]*Id.*

[41]*Id.* at 228-29 (citing *Jackson v. Virginia,* 443 U.S. 307, 316 (1979); *In re Winship,* 397 U.S. 358, 364 (1970)).

[42]*Id.*; *see also Kleve v. Hill,* 243 F.3d 1149, 1151 (9th Cir.) ("*Fiore* does no more than to reiterate" the principle stated in *Jackson,* 443 U.S. 307), *cert. denied,* 534 U.S. 948 (2001).

[43]We recognize that, in Nevada, relevant state procedural bars must be applied in these circumstances but could be overcome by a showing of actual innocence under the statute, as properly interpreted. *Cf. Pellegrini,* 117 Nev. at 886 & n.116, 34 P.3d at 536 & n.116 (acknowledging that application of statutory procedural bars is mandatory); *Bousley,* 523 U.S. at 621-24 (recognizing that where claim under new decision interpreting federal statute has been defaulted, procedural bars apply but may be defeated by showing of actual innocence).

[44]*Kleve,* 243 F.3d at 1151 (citing *Pulley v. Harris,* 465 U.S. 37, 42 (1984); *Wainwright v. Stone,* 414 U.S. 21, 23-24 (1973); *LaRue v. McCarthy,* 833 F.2d 140, 142-43 (9th Cir. 1987)).

retroactivity rules.[45] We held in *Bridgewater* that *Zgombic*'s definition of "deadly weapon" did not apply to appellants' convictions, which were already final at the time we decided *Zgombic,* because the definition was "new, unforeseeable . . . [and] not of constitutional moment."[46] Our decision that *Zgombic* announced new law is consistent with our understanding of the definition of a "new rule."[47] Moreover, by deciding that *Zgombic* announced new law, we determined, *a fortiori,* that *Zgombic* announced a change in (versus a clarification of) the law.[48]

The lack of intervening substantive amendment to NRS 193.165 in the time between our decisions in *Clem* and *Zgombic* does not bolster appellants' claim that under *Fiore* this court could not have changed the law in deciding *Zgombic*. Indeed, in its certified question to the Pennsylvania Supreme Court in *Fiore,* the United States Supreme Court explicitly contemplated that a state supreme court could make new law even in interpreting a statute for the first time.[49] And *Bunkley v. Florida,*[50] another recent United States Supreme Court opinion, demonstrates that the lack of any substantive amendment to NRS 193.165 before we decided *Zgombic* is not critical.

In *Bunkley,* the Supreme Court revisited the issues presented in *Fiore.* Bunkley had been convicted of a 1986 armed burglary under a Florida statute that enhanced the degree of burglary where a defendant is armed with a "dangerous weapon." The statute excepted the "common pocketknife" from the "dangerous weapon" definition. That language had remained unchanged since 1901. On direct appeal, Bunkley specifically argued that a pocketknife with a blade of less than four inches was a "common pocketknife." In 1989, a Florida appellate court affirmed his conviction and sentence.[51] In 1997, the Florida Supreme Court, in *L.B. v. State,*[52] interpreted the meaning of the "common pocketknife" exception—

---

[45]*See State v. Klayman,* 835 So. 2d 248, 251 (Fla. 2002).

[46]*Bridgewater,* 109 Nev. at 1161, 865 P.2d at 1167.

[47]*See Colwell v. State,* 118 Nev. 807, 819, 59 P.3d 463, 472 (2002) (defining "new rule" for the purpose of retroactivity analysis on collateral review, and noting previous definition includes "when the decision announcing [the rule] overrules precedent" (citing *Hubbard v. State,* 112 Nev. 946, 948 n.1, 920 P.2d 991, 993 n.1 (1996))), *cert. denied,* ___ U.S. ___, 124 S. Ct. 462 (2003).

[48]*Cf. Chapman v. LeMaster,* 302 F.3d 1189, 1196-97 & n.4 (10th Cir. 2002) (equating creation of a "new rule" with changing the law for purposes of *Fiore* analysis), *cert. denied,* 538 U.S. 980 (2003).

[49]531 U.S. at 226.

[50]538 U.S. 835 (2003).

[51]*Id.* at 836-37; *id.* at 844-45 (Rehnquist, C. J., dissenting).

[52]700 So. 2d 370, 373 (Fla. 1997).

for the first time—and held that a pocketknife with a blade of 3¾ inches plainly fell within the exception. Bunkley unsuccessfully sought state post-conviction relief, arguing that he was entitled to the benefit of the *L.B.* decision. The Florida Supreme Court concluded that *L.B.* did not apply retroactively because under Florida law only major changes of constitutional law applied retroactively and *L.B.* was merely an "evolutionary refinement" in the law.[53]

The United States Supreme Court granted certiorari and remanded, concluding that the Florida courts erred by "not addressing whether the *L.B.* decision means that at the time Bunkley was convicted, he was convicted of a crime—armed burglary—for which he may not be guilty."[54]

> [A]s *Fiore* holds, "retroactivity is not at issue" if the Florida Supreme Court's interpretation of the "common pocketknife" exception in *L.B.* is "a correct statement of the law when [Bunkley's] conviction became final." . . . *Fiore* requires that the Florida Supreme Court answer whether, in light of *L.B.*, Bunkley's pocketknife of 2½ to 3 inches fit within [the Florida statute's] "common pocketknife" exception at the time his conviction became final.[55]

Notably, the United States Supreme Court recognized that even though Florida's statutory language excepting common pocketknives had not been changed since 1901, the Florida Supreme Court might have changed this law, not merely clarified it, when it construed the statute. Specifically, the United States Supreme Court stated:

> Ordinarily, the Florida Supreme Court's holding that *L.B.* constitutes a change in—rather than a clarification of—the law would be sufficient to dispose of the *Fiore* question. By holding that a change in the law occurred, the Florida Supreme Court would thereby likewise have signaled that the common pocketknife exception was narrower at the time Bunkley was convicted.[56]

Thus, it is clear that under *Fiore* and *Bunkley,* a state's highest court may, by its first interpretation of a criminal statute's provisions, *either* change *or* clarify the law. It follows that where a state's highest court departs from its own previous interpretation of a statute, the new decision may also constitute either a change or a clarification of the law even though the statutory language was not

---

[53]*Bunkley,* 538 U.S. at 840.

[54]*Id.* at 838 n.*.

[55]*Id.* at 840 (citation omitted).

[56]*Id.* at 841.

changed.[57] Where a change in decisional law has occurred, the only question under *Fiore* is: when did the change occur, before or after the defendant's conviction became final? Our decision in *Zgombic* changed the law after appellants' convictions became final. Accordingly, *Fiore*'s due process considerations do not control here.

Finally, appellants contend that even if *Zgombic* announced new law and retroactivity rules should determine that law's application, our decision in *Bridgewater* was wrong. Specifically, appellants contend that *Bridgewater* erred in failing to distinguish between the retroactivity analysis for new rules of procedural law and that for new rules of substantive law. Appellants argue that because *Zgombic*'s deadly-weapon definition made substantive law, it must apply to their cases.

We reject appellants' claim that the alleged error in *Bridgewater* is reason to depart from the law of the case or constitutes good cause or a fundamental miscarriage of justice. Appellants ignore the reality that, as a state court, " 'we are free to choose the degree of retroactivity or prospectivity which we believe appropriate to the particular rule under consideration, so long as we give federal constitutional rights at least as broad a scope as the United States Supreme Court requires.' "[58] Therefore, this court is not required to make retroactive its new rules of state law that do not implicate constitutional rights.[59] This is true even where our decisions overrule or reverse prior decisions to narrow the reach of a substantive criminal statute.[60] That is, we may determine that such decisions, though we ultimately overrule them, were " 'law none the less for intermediate transactions.' "[61]

---

[57]*Cf. Chapman,* 302 F.3d at 1197-98 & n.4 (holding that where New Mexico's highest court had interpreted state criminal statute, and then later reinterpreted statute to add mens rea element, the reinterpretation could properly be treated by the New Mexico courts as a change in the law, and distinguishing *Fiore* as involving the decision of a state's highest court interpreting a statute for the first time); *see also Dixon v. Miller,* 293 F.3d 74, 79 (2d Cir.) (recognizing that *Fiore* addresses circumstance where state's highest court interprets state statute for the first time), *cert. denied,* 537 U.S. 955 (2002).

[58]*Colwell,* 118 Nev. at 818, 59 P.3d at 471 (quoting *State v. Fair,* 502 P.2d 1150, 1152 (Or. 1972)).

[59]*See Harris,* 465 U.S. at 42; *LaRue,* 833 F.2d at 143.

[60]*See Stone,* 414 U.S. at 23-24; *Chapman,* 302 F.3d at 1196-99; *LaRue,* 833 F.2d at 141-43; *see also Jackson v. State,* 925 P.2d 1195, 1197 (N.M. 1996). *But cf. Stevens v. Warden,* 114 Nev. 1217, 1221, 969 P.2d 945, 948 (1998) (recognizing that retroactivity of judicial decisions which *broaden* the reach of criminal statutes is limited by *ex post facto* guidelines); *Hernandez v. State,* 118 Nev. 513, 530, 50 P.3d 1100, 1112 (2002) (" 'A judicial interpretation of a statute *may be* retroactively applied if it is both authoritative and foreseeable.' " (emphasis added) (quoting *Kreidel v. State,* 100 Nev. 220, 222, 678 P.2d 1157, 1158 (1984))).

[61]*Stone,* 414 U.S. at 24 (quoting *Great Northern R. Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 364 (1932)).

At the time we decided *Zgombic* and *Bridgewater,* our retroactivity analysis followed the multi-factored approach outlined by the United States Supreme Court in a series of decisions led by *Linkletter v. Walker.*[62] Despite the procedural-rule focus of these decisions,[63] we applied the same analysis to determine the retroactivity of both procedural and substantive law,[64] whether made before or after a conviction became final.[65] Consistent with this approach, in *Bridgewater,* we applied the directive that ''[n]ew rules of law apply prospectively unless they are rules of constitutional law, and then they are applied retroactively only under certain circumstances.''[66]

We are mindful that our 1993 *Bridgewater* decision, with its continued reliance on the *Linkletter* analysis, did not acknowledge that the United States Supreme Court had departed from the *Linkletter* approach and adopted a retroactivity scheme that turned primarily on the timing of the new rule in relation to the finality of the conviction.[67] But as we explain, this reliance on *Linkletter* did not result in any error.

The Court's modern approach for cases not yet final, stated in *Griffith v. Kentucky,*[68] requires that new constitutional rules of criminal procedure, *i.e.,* ''new rule[s] for the conduct of criminal prosecutions,'' be applied ''retroactively to all cases, state or federal, pending on direct review or not yet final.'' We have recognized that *Griffith*'s approach applies to new constitutional rules of

---

[62]*See, e.g., Franklin v. State,* 98 Nev. 266, 269 & n.2, 646 P.2d 543, 544-45 & n.2 (1982) (citing *Linkletter v. Walker,* 381 U.S. 618, 627 (1965); *Tehan v. Shott,* 382 U.S. 406 (1966)); *Gier v. District Court,* 106 Nev. 208, 212, 789 P.2d 1245, 1248 (1990) (relying on *Franklin); Buffington v. State,* 110 Nev. 124, 127, 868 P.2d 643, 645 (1994) (relying on *Franklin* and *Gier).*

[63]*See generally Johnson v. New Jersey,* 384 U.S. 719, 726-27 (1966) (recognizing that *Johnson v. New Jersey,* like *Linkletter* and *Tehan v. Shott,* involved retroactivity of constitutional rules of criminal procedure); *Stovall v. Denno,* 388 U.S. 293, 296-97 (1967) (similar).

[64]*See, e.g., Gier,* 106 Nev. at 212, 789 P.2d at 1248 (addressing new rule involving notice to target of grand jury proceedings); *Buffington,* 110 Nev. at 127, 868 P.2d at 645 (addressing decision interpreting reach of criminal restitution statute); *Klosterman v. Cummings,* 86 Nev. 684, 688, 476 P.2d 14, 17 (1970) (stating that under *Linkletter* analysis, ''changes in law, whether substantive or procedural may be accorded prospective application'').

[65]*See generally Franklin,* 98 Nev. at 269 & n.2, 646 P.2d at 544-45 & n.2 (discussing retroactivity in relation to finality of conviction); *see also Teague v. Lane,* 489 U.S. 288, 302-03 (1989) (plurality opinion) (discussing Supreme Court's application of *Linkletter* approach on direct and collateral review).

[66]109 Nev. at 1161, 865 P.2d at 1167 (citing *Gier,* 106 Nev. at 212, 789 P.2d at 1248).

[67]*See United States v. Johnson,* 457 U.S. 537 (1982); *Griffith v. Kentucky,* 479 U.S. 314 (1987); *Teague,* 489 U.S. 288; *Sawyer v. Smith,* 497 U.S. 227 (1990). *See generally Colwell,* 118 Nev. at 816-17, 59 P.3d at 469-70 (recognizing United States Supreme Court's replacement of retroactivity analysis).

[68]479 U.S. at 328.

criminal procedure made before a conviction becomes final.[69] In *Richmond v. State,*[70] we also adopted *Griffith*'s retroactivity requirement for new rules of state law made before a conviction is final, providing the new-rule issue is preserved in district court.

*Teague v. Lane*[71] sets forth the United States Supreme Court's current retroactivity analysis for cases which became final before the new rule is made. Under *Teague,* new constitutional rules of criminal procedure will not apply retroactively to cases that have become final before the rules are announced unless they fall into one of two narrow exceptions.[72] In *Colwell v. State,*[73] we adopted for Nevada a modified *Teague* approach, which more strictly construes the meaning of "a new rule" and more liberally defines the two exceptions to the usual rule of nonretroactivity. Under *Colwell,* when a constitutional rule qualifies as "new," it will apply retroactively in only two instances: "(1) if the rule establishes that it is unconstitutional to proscribe certain conduct as criminal or to impose a type of punishment on certain defendants because of their status or offense; or (2) if it establishes a procedure without which the likelihood of an accurate conviction is seriously diminished."[74] Therefore, on collateral review under *Colwell,* if a rule is not new, it applies retroactively; if it is new, but not a constitutional rule, it does not apply retroactively; and if it is new and constitutional, then it applies retroactively only if it falls within one of *Colwell*'s delineated exceptions.

We consider our current retroactivity approaches in *Colwell* and *Richmond* appropriate to guide future questions on the retroactivity of our own new decisions, whether they interpret substantive provisions of criminal statutes or announce procedural rules. However, this evolution in retroactivity law is of no consequence to and provides no relief for appellants. Although we decided *Colwell* after *Zgombic* (1990) and *Bridgewater* (1993), we recognized in *Colwell* that Nevada is merely required to adhere to the minimum requirements of *Teague* (1989). Both *Teague* and *Colwell* require limited retroactivity on collateral review, but neither upset the usual rule of nonretroactivity for rules that carry no constitutional

---

[69]*See, e.g., Johnson v. State,* 118 Nev. 787, 801-02, 59 P.3d 450, 460 (2002); *Doyle v. State,* 116 Nev. 148, 157, 995 P.2d 465, 470-71 (2000).

[70]118 Nev. 924, 929, 59 P.3d 1249, 1252 (2002).

[71]489 U.S. 288.

[72]*See Sawyer,* 497 U.S. at 241-42 (citing *Saffle v. Parks,* 494 U.S. 484, 486, 495 (1990); *Penry v. Lynaugh,* 492 U.S. 302, 330 (1989); *Teague,* 489 U.S. at 311-13 (plurality opinion)).

[73]118 Nev. at 819-20, 59 P.3d at 470-72.

[74]*Id.* at 820, 59 P.3d at 472.

significance. Our decision in *Zgombic* did not create a new constitutional rule; consequently, no error stemmed from our continued reliance on the *Linkletter* approach in *Bridgewater*.[75]

Appellants mistakenly rely on the United States Supreme Court's decision in *Bousley v. United States*[76] for the proposition that Nevada courts are bound to retroactively apply our decisions interpreting substantive provisions of Nevada's criminal statutes. In *Bousley,* the Court held that Bousley, who had been convicted of "using" a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), could pursue in habeas a claim under *Bailey v. United States,*[77] which was decided after Bousley's conviction was final. *Bailey* held that 18 U.S.C. § 924(c)(1)'s "use" prong requires the government to show "active employment of the firearm."[78] The Court rejected the argument that Bousley's claim was barred by *Teague,* stating that there was no new constitutional principle involved, and that because *Teague* applies only to procedural rules, "it is inapplicable to the situation in which [the Supreme] Court decides the meaning of a criminal statute enacted by Congress."[79]

Appellants do not demonstrate that *Bousley* provided a new basis upon which to construct a claim. Further, we think *Bousley*'s rule for United States Supreme Court decisions interpreting federal statutes can be understood as correlative to the rule reiterated in *Fiore* for state court decisions clarifying state statutes. That is, in *Bousley,* the Supreme Court implicitly indicates that its decisions which interpret the substantive provisions of federal statutes are to be regarded as clarifications of the law. However, we have already determined that *Fiore* is not controlling here. Additionally, *Bousley* addresses only the retroactivity of United States Supreme Court decisions interpreting the meaning of federal criminal statutes. It does not bind this court. Nor does it undermine our choice to apply the same retroactivity approach to both decisions announcing new procedural rules and decisions newly interpreting the substantive provisions of state criminal statutes.

In sum, appellants have failed to demonstrate any error in the law of the case, and have also failed to show good cause for their delayed and successive claims or a fundamental miscarriage of justice. Thus, they cannot avoid the applicable state procedural bars.

---

[75]*See Chapman,* 302 F.3d at 1196-99 (upholding New Mexico's similar continued application of *Linkletter* analysis).

[76]523 U.S. 614.

[77]516 U.S. 137, 144 (1995).

[78]*Bousley,* 523 U.S. at 616-18.

[79]*Id.* at 620.

## CONCLUSION

For the reasons stated above, we conclude that appellants' claims are precluded by the law of the case and are procedurally barred pursuant to the provisions of NRS Chapter 34. Accordingly, we affirm the district court's orders denying relief on appellants' petitions.[80]

---

[80]THE HONORABLE MYRON E. LEAVITT, Justice, did not participate in the decision of this matter.